UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:25-CR-131 |
| | ) | |
| vs. | ) | |
| | ) | |
| XANA DAYANAE DOVE, | ) | |
| | ) | |
| Defendant. | ) | |

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
MARCH 10, 2026

APPEARANCES:

On Behalf of the Government:

DANA OWEN WASHINGTON, ESQ.
United States Attorney's Office
227 West Trade Street, Suite 1700
Charlotte, North Carolina 28202

On Behalf of the Defendant:

W. ROB HEROY, ESQ.
Goodman Carr Laughrun Greene Heroy, PLLC
301 South McDowell Street, Suite 602
Charlotte, North Carolina 28204

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

P R O C E E D I N G S

THE COURT: All right. Our first case this morning is United States versus Dove, docket number 3:25-cr-131.

Ms. Dove pled guilty before a magistrate judge on October 8 of last year during a plea and Rule 11 hearing and you answered questions under oath. Based on your answers, the magistrate judge found that your plea was knowing and voluntarily made and your plea was accepted. No objections were filed to the findings of the magistrate judge and this Court adopts them as its own. The Court also finds that there is a factual basis for the plea based on the unobjected to offense conduct in the presentence report.

Ms. Dove, as I'm sure you're aware, the probation office prepared a presentence report. Have you read that report?

THE DEFENDANT: Yes.

THE COURT: Do you understand everything that's in it?

THE DEFENDANT: Yes.

THE COURT: Have you had all the time that you would like to discuss it with Mr. Heroy?

THE DEFENDANT: Yes.

THE COURT: Mr. Heroy, you have several objections to the report.

MR. HEROY: That is correct, Your Honor.

THE COURT: Be glad to hear from you on those. Let's start with the abuse of position of trust.

MR. HEROY: Yes, Your Honor.

I would say that is sort of the low hanging fruit. I just don't see any way that her status as a police officer significantly contributed to the offense. She could have gone in and bought the gun the same day whether or not she was a police officer or not. I don't think the government's response does much to change that as far as saying that maybe it somehow significantly emboldened the parties. But with this objection falling on the government, I'm happy to answer any questions about it, but it doesn't seem like this is something where she should receive points.

THE COURT: Mr. Washington.

MR. WASHINGTON: Your Honor, it's true that she didn't utilize her status when she was making the purchase, but it seems -- it seems pretty plain that in going to a police officer, that certainly provided comfort and assurance to the illegal alien who made the purchase of the gun. So in that respect her status did in fact facilitate commission of the offense, and that's the government's argument, Your Honor.

THE COURT: All right. Well, the Court agrees with the defense. The fact that she was a police officer didn't in any way facilitate the offense. It's a 3553(a) factor to be sure, but whether or not she was a police officer, nothing was

different about this straw purchase and so the Court will sustain that objection by the defense.

Now let me hear you about the base offense level at paragraphs 29 and 30.

MR. HEROY: Yes, Your Honor.

I think this one is a more difficult argument for the defense to make and I'll freely admit that.

The way it started off is that the argument was initially phrased as whether or not he was on a student visa and whether or not she knew that was expired. I don't think there's any evidence to suggest that she knew that was expired.

I think, after reading the government's response to my objections, it appears that the government's argument has changed a little bit here and they're now saying that just her knowledge of the fact that he was on a student visa is enough to get over the hump. And after reading what the government has put forward, I would agree with the government's argument that someone who is on a student visa is not allowed to possess a firearm. However, the second prong of that -- and this applies to both of the enhancements. First with the base offense level and second with regard to the (b)(6) enhancement, or whatever it is, that she reasonably knew the person was not allowed to possess a firearm.

And I think that's where the argument gets a lot

trickier and it becomes a much closer call, and I think that's where the burden being on the government is what shifts this in the other direction. The fact that someone who is not a firearms expert should know whether or not someone on a student visa is allowed to lawfully possess a firearm or not, I just don't know that that falls under something that people would naturally know.

Ms. Dove was interviewed about this multiple times. First I'll address the government's strongest argument. I think during one of the interviews -- and there's hours and hours of interviews that go on and she says something that suggests that maybe he wasn't allowed to have the gun, but at other points during the same interviews she says that she just thought it would be easier for her to get the gun. And she knew Mr. Jackson from track. You know, she knew he wasn't just some random illegal immigrant. She knew him. She didn't know him to be a felon.

The fact that she is supposed to know that someone on a student visa can or can't possess a firearm, I think that falls beyond the ken of a lay person or a police officer. I think if you're an ATF agent or maybe a federal prosecutor, that's something that you know; but even then I think that is questionable given the various circuit decisions interpreting when someone is allowed to have a firearm based on their immigration status.

I'm happy to answer any questions on that.

THE COURT: Thank you.

Mr. Washington.

MR. WASHINGTON: Thank you, Your Honor.

During her interview with Special Agent Triston Darty from the FBI who is sitting right next to me, he asked her, "Why didn't he just go in and buy the gun for himself?" And she answered, and I quoted it in the government's brief, "Oh, cause the first thing he said was he was an immigrant with a visa and the first time that he went, something about they told him he couldn't get it because he was on a visa. And I was like, oh, okay, you know. I don't see any issue with it. Honestly didn't know anything was wrong because I -- I like -- I know his character. And from my understanding I don't think anything happened with the gun because he would have told me."

So she explains that she knew that he couldn't get a gun. First of all, the crime doesn't make any sense if he could have bought the gun for himself because why wouldn't he have just done it? And second, when asked, she explained that he had been denied.

So she knew that he was a prohibited person when she committed this offense and therefore she qualifies for that enhancement.

THE COURT: Yeah, the Court believes that she

probably knew as a police officer that he was not permitted to have a firearm. But the portion of her interview Mr. Washington just quoted and was put in document 30 at page 3 explicitly says that she knew he had tried to get the gun one time before and had been denied, which would suggest that he's not supposed to have a gun.

So the Court for those reasons will overrule that objection.

MR. HEROY: Yes, Your Honor.

The last objection I'm kind of surprised we haven't seen any case law come down about this by now, but it goes to the sentencing points and --

THE COURT: Well, you kind of skipped over, you've got kind of a double counting argument --

MR. HEROY: Oh.

THE COURT: -- about the base offense level.

MR. HEROY: I think that's really better suited for a 3553(a) argument, Your Honor.

THE COURT: Yeah, for whatever reason, the sentencing commission has said exactly what it said. It is a little bit difficult to parse the difference between the enhancement and the base offense level, but it is what it is.

MR. HEROY: It is what it is.

THE COURT: All right.

MR. HEROY: So I won't argue any further on that.

THE COURT: And then the criminal history points.

MR. HEROY: Yes, Your Honor.

She received on both of those offenses a couple days apart a 6- to 17-month sentence. I attached the relevant portions of the North Carolina Sentencing Code as exhibits and -- but as far as that goes, the last nine months of that are post-supervised release which is something she, you know, does not serve active time for. And so when we talk about the maximum sentence that's imposed, the maximum term of imprisonment that she can do on that offense is six to eight months; and then if she went back and violated the supervised release, she could do another nine months.

But it does make a difference because it bumps each of those up from 2-point offenses to 3-point offenses which would take her from a criminal history category II to a criminal history category III.

And my analogy is a federal sentence. If someone receives, you know, a 12-month sentence exactly and it's not a 13-month sentence, that person could certainly wind up doing 24 months if they violate their supervised release after the initial 12 months; but when the Court looks at that sentence, it still treats it as a 12-month sentence as opposed to, you know, whatever the maximum she could do if she were violated on her supervised release. So I don't think it is just to count it that way.

Thank you, Your Honor.

THE COURT: Mr. Washington.

MR. WASHINGTON: Your Honor, I cite the Fourth Circuit cases of *Barlow* and *Valesquez* which seem to address this issue. *Valesquez* concludes, "Simply put, under *Barlow* the theory of post-release supervision is part of a term of imprisonment and not the equivalent of a suspended sentence." So I think that post -- that automatic post-release nine months that's added in counts as a part of the term of imprisonment under both of those cases.

THE COURT: Yeah, I think the Fourth Circuit has given us guidance on this, which, of course, is binding on this Court and the criminal history points are correctly calculated. The Court will overrule that objection.

Is that all of them, Mr. Heroy?

MR. HEROY: That's it for the objections, Your Honor.

THE COURT: All right. Then with those rulings, the Court finds that before consideration of variance, the guidelines provide for an offense level of 13, criminal history category III, and an advisory range of 18 to 24 months.

Mr. Heroy.

MR. HEROY: Yes, Your Honor.

I know the Court might view Ms. Dove as -- you know,

from reading the presentence report and reading the government's response to the objections, as some sort of character out of The Wire where she's, you know, just out there furthering drug dealers and, you know, being someone who is a menace to society. I think the truth is different than that. I think she's someone who unfortunately, and she'll tell you this as well, she grew up from a different background and she maintained a number of associations with people she shouldn't have and she let herself be swayed, and I think that's the entire reason that we're here. So I'll say a couple things.

First off, yes, what she did there was something that merited significant punishment and she was significantly punished by the state. She spent, you know, a good portion of a year in various county jails as a result of those offenses. But I don't think it's a bad idea to say she should be punished today for what she is in the dock for which is providing that gun to Mr. Jackson.

As far as that goes, in looking at the 3553(a) factors, I would say there are two to three very important points.

First off is I don't think she needs to be hit in the head a second time. You know, she got hit very hard for her conduct. She spent a significant amount of time in jail and she got back on her feet. And I'm sure if the Court

decides to send her to prison again, you know, she's going to get back on her feet again, but I don't think that's necessary to get the message across. This is someone, she did her time. She's done exceptionally well. She's got a job. She's moved up in that job. She's had no new offenses. She's had no issues on probation. She's shown that she is someone that can be deterred.

And I think that's the most important thing out of all of this is -- you know, is it a terrible idea to say that she's someone that if we give her a period of supervised release, she's going to do exceptionally well on it? Not supervised release, a period of probation. She's going to do great on that. You're going to hear from some people who are here to support her that will say the same thing. She's someone that has overcome challenges her entire life and she's going to continue to do that.

Second, Your Honor, when it comes to that sentencing guideline, I can't say the Court or the government is wrong for how it applies. I think it's a close call, but I certainly understand why it might apply. But when we look at that guideline, it would treat her the same as, you know, someone who had given a gun to a felon, someone who is a drug user, someone who is in the case of a mental crisis, you know. Instead, she got this for someone that she knew who indicated that he needed it for self-defense and that he was someone

that was on a student visa, and I think that needs to be recognized as a very different type of person than someone who gives a gun knowing someone who may be using that for violent ends, to further drug dealing, something along those lines.

I think it also speaks to this that Mr. Jackson has not been prosecuted. You know, in those same interviews and in the same investigation, you know, Mr. Jackson acknowledged that he got the gun. He was never prosecuted. And maybe that comes down to the mens rea element of, you know, whether or not he knows he's not allowed to have a gun or not. I don't know what it goes down to, but while this doesn't exactly fit into a sentencing disparity between co-defendants because he was not charged, I certainly think it's something that's fair game for the Court to consider is that she was charged in this and not -- I think I can see why she was charged. You know, her initial conduct was significantly bad that I imagine she got herself in the crosshairs of various law enforcement and that's why she was picked for this.

But I think all those are reasons where if the Court looks at this, you know, would it be a bad idea to give her a chance to continue to rehabilitate herself?

If I could have one minute just to look over --

THE COURT: Of course.

MR. HEROY: -- and make sure I'm not overlooking anything else.

(Pause.)

MR. HEROY: Thank you, Your Honor.

THE COURT: Did you say there was some folks that wanted to speak on her behalf?

MR. HEROY: Yes, sir.

Say and spell your name first and then address the judge.

MS. NELSON: Good morning, Your Honor. My name is Morgan Nelson. M-o-r-g-a-n, N-e-l-s-o-n.

Your Honor, I became very involved in Dove's life December of 2025 in which she was seeking employment. During this time I also took over the schedule for our current job which is Precision Office Solutions. What I quickly learned was that I could call Dove at any time to help in any situation. For example, one night at 10:00 PM I had to get a truck picked up from the warehouse and delivered to pick up some product the next day and she got out of her bed, got in the car and came to drive that truck for me.

Consistently she has been able to fill in the gaps that I have needed for scheduling to the point that I actually decided to bring her into our warehouse. We have a 30,000 square foot warehouse. We are commercial furniture installers. Ms. Dove has barcoded and labeled that entire warehouse and organized it so efficiently that I would not survive without her, Your Honor.

Her work ethic, her reliability, communication, and everything she has done for my operation has resulted in her receiving a promotion coming this April 2026. So just in a few weeks she will be officially my warehouse manager. And without her, all the hard work that she has put in in these last few months will just go to waste and I really hope that we can work something out so that I don't lose her because she has proven and shown great work ethic and wanting to be better.

THE COURT: Thank you. I appreciate that.

MS. HYTER: Good morning, Your Honor. My name is Jaylah Hyter. That's spelled J-a-y-l-a-h, H-y-t-e-r. I'm her partner so we are in a relationship.

Since she's been released I've seen her struggle, fall down, get back up and try again, try harder. She's been doing her best to stay on the straight and narrow and every day putting in a hundred and ten percent effort to be a better her. She's definitely been doing her due diligence with, you know, making sure she has a job, making sure she's on top of her PO stuff. I've been making sure she calls her federalist every day, never misses a drug test, never misses an appointment with her PO officers or anything like that, state and federal.

As far as with the job, she's definitely grown a lot in that position to where, like Morgan mentioned, she's being

bumped up to a warehouse manager now. Everyone relies on her as far as getting things done efficiently in a good timely manner. Her dedication has been impeccable since she's been out post-release and everything.

I really, really hope you guys can work something out for her just so that she can still stay on her straight and narrow, keep doing her job, showing up to work every day on time, and just putting in an effort to be a better person and a better character as a whole.

THE COURT: Thank you.

MS. HYTER: Thank you.

MR. HEROY: This will be our final speaker, Your Honor. Mr. Jackson submitted a letter.

MR. JACKSON: Good morning, Your Honor.

THE COURT: Good morning.

MR. JACKSON: My name is Chris Jackson, commonly spelled.

I want to start first by saying when I met Ms. Dove roughly six years ago after separating from the military, she helped me through a rough time, a time of me figuring out who I am, what I want to do as a civilian. Taking her -- her taking me under her wing, kind of teaching me a lot of different things, the career she was in at the time, using that to kind of motivate me got me to where I am today.

Other than the relationships we have as our friends

or coworkers, I've watched her as a family member as well. Her family, she's plays a big role. She's a support system for her nephew. She fills a big gap in that area as well. I can even say my children, they look at her as TT.

I think she understands what happened in the past. I've only seen her work hard and every day strive to make things right. The things she do for the community, I called her -- it may have been two years ago, I called her late. I was doing a Thanksgiving drive. She never touched back, but she showed up. She's always been reliable. That's all you can ask for.

That's all I have to say.

THE COURT: Well, thank you for your service, and I'm not just saying that. Appreciate it very much.

MR. JACKSON: Thank you.

MR. HEROY: Thank you.

THE COURT: Ms. Dove, you have the right to address the Court if you would like to, but you don't have to say anything. Is there anything you'd like to say?

THE DEFENDANT: Yes. I'm nervous and I keep crying so...

THE COURT: That's all right.

THE DEFENDANT: Do you mind if I read my paper?

THE COURT: Take your time.

THE DEFENDANT: I stand before the Court fully

accepting responsibility for violating the federal firearm law. I pled guilty because I understand that what I did was wrong. I signed a federal document and provided false information. That was a serious violation of the law. That responsibility is mine.

I understand the firearm regulations exist to protect the public and ensure accountability. As someone who once wore a badge, I was held to a higher standard. I failed to meet that standard and I accept the consequences of that failure.

Since this case begun I had to confront what it feels like to watch the life I built unravel. My career, my reputation, and my dignity as someone who cared and was someone who was trusted to uphold the law were all placed in question. It is difficult to explain what it feels like. Years of discipline, sacrifice, and progress overshadowed by my conduct. There is embarrassment. There is regret. There is heavy realization that trust once lost is not easily restored.

I did not grow up under easy circumstances. I'm the first of my mother's children to graduate with a bachelor's degree. Me and my twin sister moved out here alone. We don't have family. The people behind me are my family. So we come here alone; and realizing that we don't have family support, people around you become your family.

So I let my family and familiarity cloud my judgment and I accept that and I know I was wrong. But through this process I have had to re-evaluate not just my actions but the environment and the people I hang around. I no longer hang with anybody from my past. The people behind me are just positive people. Everybody is doing something good.

Rebuilding has required humility and consistency. It required doors closing and I'm still showing up. I've been rejected for 213 jobs. I can show you my (inaudible). I still came. Even with the job now, I was afraid I was going to get turned away, but I showed up because I was like somebody is going to take the chance and somebody is going to believe me and trust me; and they took the chance and they see, like, I've changed.

I let familiarity cloud my judgment and that should have never happened, but I understand. Like, I'm a person. I'm a human. We make mistakes and I own up to that.

I'm not asking the Court to excuse my conduct. I'm asking for the opportunity to continue rebuilding the way that proves that I'm capable of responsibility and positive contribution. I understand the seriousness of standing in a federal courtroom and I don't take this lightly.

Thank you for everything.

THE COURT: Thank you.

Mr. Washington.

MR. WASHINGTON: Thank you, Your Honor.

Your Honor, I'd like to address some of the 3553(a) factors, and they are stunning.

The defendant, after graduating from college, playing basketball, becomes a cop. And that's what we want, right. We want people who know the community to become law enforcement, to become police officers. And she did. And in January of 2022 she becomes a sworn officer with the Gastonia Police Department and within six months she's committing offenses. She's violating the very duty that was placed upon her.

She has pled guilty to over a dozen violations: Going into the computer system and providing information to individuals on the street, culminating in the most significant violation was when she provided the identity of an undercover Charlotte Mecklenburg police officer to the target of the investigation. She sent the undercover cop's DMV picture.

Well, Your Honor, of course, for that she was prosecuted in Gaston County and in Mecklenburg, as counsel points out, and she received a sentence of 6 to 17 months. Basically time served.

So the entire time that she was a police officer beginning six months in, after six months she was either committing offenses or she got fired. That was her career with the police department.

Your Honor, with respect to the nature and circumstances of the offense, as pointed out in the PSR, yes, she provided the gun to a friend of hers; but as the Court noted earlier, it's hard to imagine that he wasn't emboldened by the fact that he had a police officer helping him. There were over 40 text messages between the defendant and the illegal alien. He was on an expired student visa, yes. Wasn't the worst. But there were over 40 text messages leading up to this. And it wasn't an isolated event. It kind of fits in with all of the misconduct that she was committing while -- up till then while she was a police officer with going into the computer system, with providing information to the public.

Your Honor, it's the government's position that Ms. Dove could have been a great cop. She could have been a great cop because so often police officers don't know or understand the community that they serve in. That's a problem. She didn't fall into that category. She did understand the community that she served so she could have been a great bridge. But instead of using her position as a police officer to keep them out of trouble, she did the opposite. She used her position as a police officer to help them commit crimes.

So, Your Honor, it's the government's position that -- she faces a guideline sentence of 18 to 24 months.

The Court has seen me many times. I'm not one who comes in here every time asking for the top of the guidelines, but, Your Honor, respectfully, it's the government's position that in this case it is warranted.

Thank you.

THE COURT: All right. Well, I want to make sure that I address all the arguments that have been made, particularly by the defense, and explain the reasons for the sentence that I will impose.

It has been suggested that the Court should consider that Mr. Jackson, different Mr. Jackson, was not prosecuted for this and that somehow creates a disparity. I can imagine a great many reasons why the United States chose not to prosecute Mr. Jackson, but I don't think it particularly matters. It's not really a disparity argument. Their offenses were different and their circumstances were different so I'm not particularly persuaded by that.

It was not argued today but it was argued in the sentencing memorandum that the government's waiting to bring this indictment inflated Ms. Dove's criminal history category. I have to think inflated is the wrong word. It did affect the criminal history category. But even if she had not had these convictions and the resulting criminal history category, the Court would have certainly considered an underrepresented criminal history if it had been made aware of the offense

conduct that led to those convictions, and so that's a bit of a wash.

Also in the sentencing memorandum it was represented that Ms. Dove, quote, promptly and fully admitted her conduct, unquote, which is not true. When she was first interviewed, she lied about the purchase of that gun and was not fully cooperative.

The criminal history or just even the conduct that underlies this -- what you did when you were a police officer was reprehensible. I mean, you did put people's lives at stake, your fellow law enforcement, put their lives at stake, and just willy-nilly seemed to be helping everybody that asked for confidential police information. And I went back and looked up the presentence report of one of the people you were assisting. He was a truly bad guy. And you were feeding him sensitive law enforcement information. So your brief tenure as a law enforcement officer is just awful.

And it was also argued that your criminal history is overstated because of the eight day difference between the sentences you received in Gaston and Mecklenburg Counties. In some ways, that's true. In some ways your criminal history is understated because those offenses, of which there were many -- I tried to count at one point and I just stopped, figuring, well, that's enough. I don't have to count anymore. But your breaches of the trust that was put in you as a law

enforcement officer just went on and on and on. I mean, a dozen times, 20 times. I can't remember for sure. But just more often than you were out on the streets it seems. So in some ways your criminal history category is understated because each of those could have been a separate offense.

It was also argued in the sentencing memorandum the Court should consider your youthfulness at the time of the offense. You were 26 and you were a cop. We don't excuse law enforcement officers who are young. We rightfully put a higher burden on law enforcement. When law enforcement breaks the law, it is a betrayal of society. The people that we look to to protect us we also look more harshly at when they fail in their duties, whether it's civil or criminal. We hold them to a higher standard. I think they know that. I think they kind of appreciate it and expect it.

Now, that's all the bad stuff that I had written down to say about you. There's a lot of good stuff to say about you.

You overcame a lot of challenges. I love the fact that you were the first in your family to graduate from college. Shows a lot of initiative, application of yourself. I hope that your reason for wanting to get into law enforcement, you studied criminology, as I recall, while you were an undergraduate, was you wanted to serve and that's admirable and appreciated. You just didn't do it.

You have good support out there, and I know they're going to support you no matter what this Court's sentence is. They will be there for you. I know that.

It was also argued in the sentencing memorandum by your lawyer that a prison sentence will disrupt your rehabilitation. I'm sure that's true, disrupt, but not prevent. You will get through this. I think you will come out and be just as good a person as you are right today. This isn't going to set you back, but it is going to delay you.

But the Court does recognize, as it's supposed to, your post-offense rehabilitation. That's worth something. One of the things the Court is always concerned about is is it going to see or is some other judge going to see this person again for a similar or different kind of offense? And I, again, hope and believe no judge will ever see you again. So your post-offense rehabilitation is effective on the Court.

And I also recognize Mr. Heroy's argument that the base offense level is a little bit -- I mean, you can say that it's double counted. I don't know why the sentencing commission puts an enhancement in place that essentially covers the base offense level, but it did for reasons sufficient unto itself.

And also Mr. Heroy's argument that it's the same offense whether you had straw purchased that gun for someone who apparently was not a threat to society or if you had straw

purchased it for someone who's a threat to society, the guidelines would be exactly the same, and that's worthy of consideration by the Court.

And I lastly greatly appreciate your work ethic. I think people who work and want to work are less likely to commit offenses than people who don't. And I, again, am very hopeful that your job will be waiting for you when you finish this term of imprisonment, but there has to be a term of imprisonment. This is a separate offense, separate from what you've served before. It's a serious offense.

And when we talk about general deterrence, that is, not preventing you from committing a crime again, I do want to send a message out there to law enforcement. I am going to hold you to a higher standard. And I don't think they would consider that unfair.

Now, the guidelines provide for a sentencing range of 18 to 24 months. I'm going to come down from that a little bit for the reasons I've stated. Most particularly because of your post-offense rehabilitation, but for all the reasons that I've said. But I'm not going to go down very much just because it's a very serious offense.

And so having considered all the 3553(a) factors, it is the order of the Court that Ms. Dove is committed to the custody of the Bureau of Prisons to be imprisoned for a term of 15 months.

Is there a designation request, Mr. Heroy?

MR. HEROY: As close to here as possible, Your Honor.

THE COURT: The Court recommends she be incarcerated as close to Charlotte, North Carolina, as possible.

The Court recommends that she be allowed to participate in any educational and vocational opportunities while incarcerated.

Upon release from imprisonment, defendant is placed on supervised release for a term of two years.

The Court has considered the necessary length of the term of supervised release. I think two years will provide enough time for probation to help her get back on her feet and to provide her guidance and no longer term will be necessary.

Within 72 hours of release from the Bureau of Prisons, you're to report in person to the probation office in the district into which you are released, which is presumably this one. And while on supervised release, you shall not commit another federal, state, or local crime, and shall comply with each of the discretionary conditions of supervised release that have been adopted by this Court.

It is ordered that she pay the United States a special assessment of $100.

The Court finds that she does not have the ability to pay a fine and no fine will be imposed.

The Court incorporates into this judgment the order of forfeiture that appears at document 22 of the docket.

There are no counts to be dismissed, are there, Mr. Washington?

MR. WASHINGTON: There is, Your Honor. There's a count two. Pursuant to the plea agreement, we would move to dismiss.

THE COURT: All right. That's granted.

Ms. Dove, you can appeal your conviction and your sentence, but the notice of appeal has to be filed within 14 days of entry of the Court's judgment. If you're unable to afford the cost of an appeal, if you ask, the clerk of court will file the notice of appeal on your behalf at no cost to you.

Please discuss these rights with Mr. Heroy, but do you understand them as I have explained them to you?

THE DEFENDANT: Yes.

THE COURT: Now, Mr. Washington, I assume there's no objection to letting Ms. Dove self-report.

MR. WASHINGTON: No, Your Honor.

THE COURT: So, Ms. Dove, the way this will work is you'll receive correspondence from the marshal service telling you when and where to begin service of your sentence. Please be there on time.

THE DEFENDANT: Yes, sir.

THE COURT: My guess is the conditions of your confinement will be as good as they can be in the federal prison system, but if you're late they will consider you an escape risk and your conditions might not be as good as they will be and it may even affect some of your programming.

Now, I'll also say with respect to the programming, the Court's sentence is 15 months. That doesn't mean 15 months depending on you. There are lots of opportunities to earn time off your sentence these days and I encourage you to do so. Continue your rehabilitation and earn your way out of prison.

All right. Ms. Dove, the marshals are going to need to see you just for a very few minutes to do some paperwork and then you'll be free to go under the same conditions that you've been under for this sentencing.

THE DEFENDANT: Okay.

THE COURT: I hope the best for you.

THE DEFENDANT: Thank you.

THE COURT: Mr. Heroy.

MR. HEROY: Your Honor --

THE COURT: Oh, is there a date before which she should not report? Is there something upcoming?

MR. HEROY: No, Your Honor, it's not that. And this is going to come across as nitpicking, but maybe it would make some difference when Your Honor was weighing those 3553(a)

factors.

She did promptly admit to her conduct. She did not deny it. I think when you look at the presentence report, it references Mr. Jackson when he was initially approached, he lied to law enforcement and said that he never got the gun. And then he later came around and said he did in fact receive the firearm. But Ms. Dove was not in that boat. She promptly -- she debriefed over and over again. And I don't know if it -- you know, maybe it's a crazy idea to say that's something that might have impacted a decision to go from, you know, a year and a day to 15 months. Maybe not.

THE COURT: Well, I'm referencing paragraphs 18 and 19 of the presentence report.

MR. HEROY: Yes.

THE COURT: And in 18 it states, "When asked about a Hellcat Pro 9mm firearm, she said that she did not buy it after she 'looked at the prices' because she didn't have enough money."

Then in paragraph 19, "The records from Shooters Express indicate that she did in fact purchase the Hellcat Pro 9mm and did not a Taurus G2."

MR. HEROY: I think she was saying where she bought the firearm and then it also had to do with the amount of money Mr. Jackson had given her to purchase the firearm, and I don't know if we would want to consult with law enforcement.

I don't think they ever felt she was dishonest.

MR. WASHINGTON: I don't -- we stand by what's in that paragraph. That was one of the concerns when we first looked at the case. She did not admit to buying the gun that she actually bought. She said that she bought something else.

THE COURT: All right.

MR. WASHINGTON: That paragraph is accurate.

THE COURT: While what we've been discussing was a factor for the Court's decision, it certainly wasn't a controlling factor. And even if the Court were wrong about that, which I don't think I am, the sentence would remain the same.

MR. HEROY: Yes, Your Honor. Sorry for questioning that.

THE COURT: That's all right. No, advocacy is your job.

All right. This matter is concluded.

MR. WASHINGTON: Thank you.

(End of proceedings at 10:11 AM.)

*****

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER

I, Cheryl A. Nuccio, Federal Official Realtime Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 10th day of April 2026.

s/Cheryl A. Nuccio
_________________________
Cheryl A. Nuccio, RMR-CRR
Official Court Reporter